UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH R. LEWIS,

<table>
<tr><td>Plaintiff,</td><td>Civil Action No. 13-10786</td></tr>
<tr><td></td><td>Honorable Stephen J. Murphy, III</td></tr>
<tr><td></td><td>Magistrate Judge David R. Grand</td></tr>
</table>

v.

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 15]**

Plaintiff Kenneth R. Lewis ("Lewis") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [12, 15], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") erred in multiple respects and that his conclusion that Lewis is not disabled under the Act is not supported by substantial evidence. The Court recommends that the Commissioner's Motion for Summary Judgment [15] be DENIED, Lewis' Motion for Summary Judgment [12] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be

REMANDED to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Procedural History

On June 11, 2009, Lewis filed applications for DIB and SSI, alleging disability beginning on April 3, 2009.  (Tr. 126-35).  His claims were initially denied.  (Tr. 64-71).  Thereafter, Lewis filed a timely request for an administrative hearing, which was held on August 3, 2011, before ALJ Walter Orr.  (Tr. 30-60).  Lewis (represented by attorney Clifford Walkon) testified at the hearing, as did vocational expert Michael Rosko.  (*Id.*).  On January 10, 2012, the ALJ issued a written decision finding that Lewis is not disabled.  (Tr. 18-26).  On January 30, 2013, the Appeals Council denied review.  (Tr. 1-5).  Lewis filed for judicial review of the final decision on February 26, 2013.  (Doc. #1).

### B.    Background

#### 1.    Disability Reports

In a June 12, 2009 disability field office report, Lewis reported that his alleged onset date was April 3, 2009.  (Tr. 145).  During a face-to-face interview, the claims examiner noted that Lewis had difficulty sitting and walking.  (Tr. 146).  The claims examiner further observed that Lewis used a walker and was wearing a neck brace.  (*Id.*).

In an undated disability report, Lewis indicated that he stopped working after he was in a serious car accident and that his ability to work is limited by a spinal cord injury, disc herniation, nerve damage, and post-traumatic stress disorder.  (Tr. 149).  According to Lewis, his conditions began bothering him on April 3, 2009, and he has not worked since that time.  (*Id.*).  At the time of the report, he was taking numerous medications for anxiety, pain, and other conditions.  (Tr. 153).

In a function report dated July 2, 2009, Lewis reported that he lives in a house with

2

friends.  (Tr. 172).   When asked to describe his daily activities, Lewis indicated only that he might try to do some light exercises to "help heal [his] injuries" or attend a doctor's appointment; otherwise, he will just "sit around and rest."   (*Id.*).   His conditions affect his sleep, as it is difficult for him to lie down and fall asleep.  (Tr. 173).   He has some difficulty with personal care (such as lifting himself in and out of the bathtub and lifting his shoulder to put on his clothes).  (*Id.*).   He does not cook because he does not have a stove.  (Tr. 174).   He is able to wash dishes, attend to "small trash removal," and perform light sweeping and cleaning on a daily basis.   (*Id.*).   He is able to ride in a car and use public transportation, but he does not drive because his car was "destroyed" in the accident.  (Tr. 175).   He is able to shop for small items (such as bread and fruit) a couple of times a week.  (*Id.*).   He is able to count change and handle a checking and savings account, but he cannot pay bills because he has no "cash flow."  (*Id.*).   His hobbies include "serving the Lord" on a daily basis, and bowling "once every blue moon."  (Tr. 176).   He spends time with others and goes to doctors' appointments and his mother's house.  (*Id.*).

When asked to identify functions impacted by his condition, Lewis checked lifting, standing, reaching, kneeling, stair climbing, seeing, and getting along with others.  (Tr. 177). Lewis further indicated that he cannot lift more than ten pounds and cannot do any reaching. (*Id.*).   He can walk approximately ½ mile before he needs to stop and rest for ten minutes.[1]  (*Id.*). He does not finish what he starts, but he gets along well with authority figures and has never been fired from a job because of problems getting along with other people.  (Tr. 177-78).   He is afraid when he is riding in a car and other cars "fly by."  (Tr. 178).   He uses a walker and a cane, both of which were prescribed by his doctor in April 2009.  (*Id.*).[2]

---

[1] The Commissioner incorrectly asserts that Lewis reported that he could walk "four miles at a time before needing a 10-minute rest."  (Doc. #15 at 17) (citing Tr. 177).

[2] In a third party function report dated July 2, 2009, Rosalyn Smith generally corroborated

2.    *Hearing Testimony*

At the time of the August 3, 2011 hearing before the ALJ, Lewis was 50 years old.  (Tr. 35).  He testified that he lives in a house with his mother and sister.  (Tr. 34).  He has a high school diploma and is able to drive.  (Tr. 35-36).  Lewis further testified that he was convicted of a felony (aiding and abetting in a robbery) and was incarcerated from 1982 to 2000.  (Tr. 39-40).  Following his release from prison, Lewis worked as hi-lo operator for about three years, which required him to lift 75-150 pounds.  (Tr. 37-38, 150).  After that, Lewis worked for a few years as a maintenance man, which required him to stand for his entire eight-hour shift and lift 100 pounds or more.  (Tr. 37).

Lewis testified that, while working in April 2009, he was in a serious automobile accident.  (Tr. 36, 40).  Lewis was hit by a drunk driver, and his car was totaled.  (Tr. 40).  Lewis testified that, following this accident, he was hospitalized and had fusion surgery on his neck.[3] (Tr. 41-42).  He still has difficulty moving his head; the pain radiates down his left arm; and he has difficulty holding objects with his left hand and reaching forward and overhead with his left arm.  (Tr. 42-43, 47).  In addition, he has pain and swelling in his right leg and uses a cane, which was prescribed by his doctor.  (Tr. 47-48).

Lewis testified that he does not take any medication for pain, because he does not have insurance; rather, he tries to alleviate the pain by lying down in the morning and the afternoon, or by taking a hot shower.  (Tr. 43-46).  He can sit or stand for only thirty minutes before he needs

---

Lewis' statements.  (Tr. 156-63).

[3] Lewis testified that he received unemployment benefits after this car accident.  (Tr. 54).  Under questioning by the ALJ, Lewis acknowledged that, in order to receive these benefits, he represented to the Michigan Unemployment Insurance Agency that he was able and willing to work.  (Tr. 55).  Lewis further admitted that, at the same time, he was telling the Social Security Agency that he was disabled and could not work.  (*Id.*).  According to Lewis, he "wasn't comfortable" with making these inconsistent representations.  (*Id.*).

to change position.  (Tr. 49-50).  Lewis can walk about one block with his cane, and about ½ block without the cane.  (Tr. 50).  He testified that he can lift "maybe 10 pounds."  (*Id.*).

### 3.  *Medical Records*

#### (a)   *Physical Impairments*

On April 3, 2009, Lewis was involved in a motor vehicle accident when he was hit by a drunk driver and suffered serious physical injuries.  He was transported to St. John Macomb Hospital by ambulance.  (Tr. 199).  A CT was performed of Lewis' cervical spine, which revealed no evidence of acute fracture.  (Tr. 201-02).  The spinal canal was unremarkable between C1 and C4, but below that level, the spinal canal was not "well seen due to shoulder artifact."  (Tr. 202).  Lewis was discharged from the hospital the same day.  (Tr. 198).

A few days later, on April 8, 2009, Lewis presented at the Sinai-Grace emergency room, complaining of increasing pain in his neck, with numbness of his left arm and intermittent parasthesias of his left leg.  (Tr. 207).  A CT of Lewis' abdomen and pelvis was negative, as were CT scans of his head and cervical spine.  (Tr. 210, 229, 231, 233).  However, an MRI of his cervical spine showed an "enhancement of the cervical spinal cord indicative of a possible injury."  (Tr. 210, 239-40, 262).  Consequently, on April 13, 2009, Lewis underwent an anterior cervical discectomy with fusion and fixation.  (Tr. 211-15, 262).  An x-ray of Lewis' cervical spine performed the next day showed postsurgical changes in the form of metallic plate and screws at C6-C7, with no evidence of fracture, dislocation, or soft tissue abnormality.  (Tr. 221).  A follow-up cervical spine x-ray performed on May 19, 2009, showed the same postsurgical changes; however, the C7-T1 level was "not well evaluated."  (Tr. 219).

Lewis followed up at Sinai Grace in May, June, and July 2009 and was prescribed Norco, Vicodin, and tramadol for pain.  (Tr. 286, 287, 289, 290).  On July 7, 2009, Lewis saw Kelly

Evans, APRN-BC, in follow-up regarding his cervical fusion surgery. (Tr. 277). Nurse Evans reported that Lewis continued to be depressed from neck and shoulder pain, and had been unable to get prescribed medications or participate in physical therapy "because of insurance." (*Id.*). She placed Lewis on a 10-pound lifting restriction and indicated that "he should be able to get back to work at some point." (*Id.*). On September 1, 2009, Lewis returned to Sinai-Grace complaining of pain in his back and right ankle. (Tr. 280). He received a steroid injection in his ankle, and his prescriptions were renewed. (*Id.*).

On September 23, 2009, Lewis was examined by a consultative internal medicine expert, Dr. Cynthia Shelby-Lane of Sierra Medical Group. (Tr. 297-305). Dr. Shelby-Lane noted that Lewis underwent neck surgery in April 2009 and that he suffered from chronic neck and shoulder pain. (Tr. 298-99). Lewis was wearing a soft cervical collar "for ongoing pain management and limitation in range of motion," which was not removed for the examination. (Tr. 299-300). On examination, Lewis was able to get on and off the table without difficulty, and his gait and stance were normal. (Tr. 299). He was able to squat and bend to 50% and recover, and his grip strength was equal bilaterally. (*Id.*). In conclusion, Dr. Shelby-Lane opined that Lewis "should avoid repetitive and heavy lifting, bending, pushing and pulling and use of his upper extremities." (Tr. 300). Dr. Shelby-Lane further opined that Lewis needed "ongoing mental health care for his post-traumatic stress disorder." (*Id.*).

The record also contains a physical residual functional capacity assessment performed by John Santeramo, a state agency single decisionmaker. (Tr. 306-13). This analysis, dated October 5, 2009, concluded that Lewis is capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, and standing and sitting for six hours in an eight-hour workday, with certain postural limitations. (Tr. 307-08).

On October 12, 2009, Lewis was seen again at Sinai-Grace for complaints of left shoulder stiffness and headaches. (Tr. 339). He was prescribed Naprosyn and Motrin for pain. (*Id.*).

On September 30, 2010, Lewis sought treatment for right knee pain. (Tr. 333-35). At that time, his muscle strength was 5/5 in both the upper and lower extremities. (Tr. 334). It was noted that, "The patient is not currently on any medications because he is 'so frustrated about all the doctors [he has] to see.'" (*Id.*). Indeed, Lewis indicated that he had not been taking any medication for the last four or five months, and said that he was a "young healthy man" and that he could "take care of his health without anybody's help." (*Id.*). Lewis was diagnosed with claudication secondary to peripheral arterial disease and advised to increase his activity gradually over the next few weeks. (*Id.*).

On February 9, 2011, Lewis again sought treatment at Sinai-Grace, complaining of non-radiating left shoulder pain and indicating that he needed a disability form completed. (Tr. 359). Lewis' left arm strength was 4/5 and he had 5/5 strength in all other extremities. (*Id.*). Dr. Sunitha Venusopal completed a disability form, opining that Lewis "cannot perform full-time job secondary to cervical myelopathy." (Tr. 356-57).

            *(b)      Mental Impairments*

At a July 5, 2009 visit to Sinai-Grace, Lewis was referred to a social worker because of his complaints of depression and anxiety. (Tr. 288). A few weeks later, on July 29, 2009, Lewis again met with the social worker and described ongoing insomnia and recurring thoughts of the accident. (Tr. 284). He indicated that he had not started taking Zoloft or Xanax, both of which had been prescribed, nor was he taking Vicodin for pain because he felt that he should be able to manage his problems with "prayer and faith." (Tr. 285). On August 8 and 19, 2009, Lewis

again saw the social worker, who noted that he continued to appear sad and ruminated on the car accident and his severe pain.  (Tr. 281-83).

On August 19, 2009, Lewis also underwent a psychiatric evaluation at Sinai-Grace.  (Tr. 267-69).  Lewis indicated that he was "getting more depressed" and "worrying all the time."  (Tr. 267).  He described having a lot of pain in his back, arms, and throughout his body, and acknowledged feeling very anxious.  (*Id.*).  He said that he could no longer drive, as he had become very nervous since the accident and would start sweating and have to pull over.  (*Id.*).  On examination, Lewis had fair to poor eye contact, and his thoughts were "preoccupied with somatic symptoms related to the motor vehicle accident."  (Tr. 268).  He described having difficulty sleeping, saying that he experienced nightmares and night sweats.  (*Id.*).  Lewis was diagnosed with adjustment disorder with mixed features and depressed mood and anxiety and assigned a Global Assessment of Functioning ("GAF")[4] score of 45.  (*Id.*).  He was prescribed Paxil and trazodone and instructed to follow up with a therapist.  (Tr. 268-69).

Lewis saw a social worker again on September 11, 2009, continuing to complain of severe pain that affected his daily functioning.  (Tr. 343).  A couple of weeks later, on September 23, 2009, Lewis was seen in follow-up.  (*Id.*).  He was noted to have some mild sleep improvement, but his affect was constricted, his mood was very anxious, his speech was "almost pressured," and his thoughts were preoccupied with stressors of finances and chronic pain.  (*Id.*).  On October 7, 2009, there was "no significant change" in Lewis' symptoms; he continued to be preoccupied with his health concerns.  (Tr. 342).

On September 23, 2009, Dr. Gummadi performed a consultative psychiatric examination.

---

[4]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

(Tr. 292-94). Lewis complained of feeling depressed, crying spells, feelings of hopelessness and helplessness, poor memory, poor concentration, nightmares, and flashbacks to the accident. (Tr. 292). He indicated taking numerous medications. (*Id.*). Lewis further reported that his typical day involved sitting at home talking to his mother and going to church. (Tr. 293). Dr. Gummadi noted that Lewis had "some trouble remembering things," and he observed that Lewis seemed motivated to get back to work and did not tend to exaggerate his symptoms. (*Id.*). Lewis' mood was depressed, and his affect was constricted. (*Id.*). He was oriented to time, place, and person and was able to repeat four digits forward and backward. (*Id.*). Dr. Gummadi diagnosed Lewis with a mood disorder secondary to general medical condition, characterized his prognosis as "guarded," and assigned him a GAF score of 50. (Tr. 294). Dr. Gummadi further opined:

> Based on today's examination, the patient seemed to be able to understand, retain and follow simple instructions. He would be able to perform simple, routine, repetitive tasks. Due to his depression and psychomotor retardation, he would be best able to function in a setting where there is brief interaction with coworkers, supervisors and the public.

(*Id.*).

On October 5, 2009, state agency consultant Sheila Williams-White reviewed the evidence of record and completed a Psychiatric Review Technique form, opining that Lewis' mental impairment (affective disorder) is not severe. (Tr. 314-27). According to Ms. Williams-White, Lewis has only mild limitations in activities of daily living and in maintaining concentration, persistence, and pace; no limitations in maintaining social functioning; and has suffered no episodes of decompensation. (Tr. 324). In summary, Ms. Williams-White concluded that Lewis' activities of daily living are not significantly limited by his mental functioning, noting that he "just started mental health treatment." (Tr. 326).

On September 30, 2010, Lewis returned to the behavioral health clinic at Sinai-Grace after an absence of almost one year. (Tr. 336). He indicated that he had stopped taking Paxil

and trazodone at that time, and he felt that he had been "doing OK," despite a lot of stress about his finances. (*Id.*).

4.      *Vocational Expert's Testimony*

Michael Rosko testified as an independent vocational expert ("VE"). (Tr. 56-59). The VE testified that Lewis has three jobs which constitute past relevant work: janitor (unskilled in nature and performed at the medium or heavy exertional level); shipping and receiving clerk (semi-skilled in nature and performed at the medium exertional level); and forklift driver (semi-skilled in nature and classified as medium work by the Dictionary of Occupational Titles ("DOT"), but performed at the very heavy level by Lewis). (Tr. 56-57). The ALJ asked the VE whether any of these jobs would "permit limitations of never climbing ropes, ladders, and scaffolds, and only occasionally making postural changes such as kneeling, crawling, stooping, crouching, et cetera." (Tr. 57). The VE testified that a shipping and receiving clerk might have to climb ladders, and a janitor would be required to perform more than occasional postural maneuvers such as bending and twisting; thus, only the position of forklift driver could be performed with these limitations. (Tr. 57-58).

Upon questioning by Lewis' attorney, the VE testified that a forklift driver would be required to climb onto and off of the machine. (Tr. 58). In addition, the VE testified that an individual with a 10-pound lifting restriction would not be able to perform any of Lewis' past relevant work. (Tr. 58-59).

**C.      Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

10

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the
> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers

to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir.

1994).

#### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Lewis is not disabled

11

under the Act.  At Step One, the ALJ found that Lewis has not engaged in substantial gainful activity since April 3, 2009, the alleged onset date.  (Tr. 20).  At Step Two, the ALJ found that Lewis has the severe impairment of "degenerative back disease."  (*Id.*).  The ALJ also found at Step Two that Lewis' mood disorder, while a medically determinable impairment, does not cause more than a minimal limitation on his ability to perform basic mental work activities and, thus, is non-severe.  (Tr. 20-22).  At Step Three, the ALJ found that Lewis' impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 22).

The ALJ then assessed Lewis' residual functional capacity ("RFC"), concluding that he is capable of performing medium work, except that he can never climb ropes, ladders, or scaffolds, and can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  (Tr. 22-25).  At Step Four, the ALJ determined that Lewis is able to perform his past relevant work as a forklift driver.  (Tr. 25).  As a result, the ALJ concluded that Lewis is not disabled under the Act.  (Tr. 26).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the

merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

The ALJ's decision in this case contains numerous errors which the Court will address in detail below.  As an initial matter, the ALJ found at Step Two that Lewis has the severe impairment of "degenerative back disease."  However, as Lewis points out, he does not, in fact, have any "back impairment."  (Doc. #16 at 2).  Rather, he suffers from a neck impairment (status post-neck fusion surgery).  (*Id.* at 1).  The ALJ also found at Step Two that Lewis' mood disorder, while a medically determinable impairment, does not cause more than a minimal limitation on his ability to perform basic mental work activities and, thus, is non-severe within the meaning of the Act.  (Tr. 20-22).  Yet, the ALJ gave "some weight" to the opinion of the psychiatric examiner, Dr. Gummadi, who opined that Lewis would only be able to "understand, retain, and follow simple instructions," "perform simple, routine, repetitive tasks," and "would be best able to function in a setting where there was only brief interaction with coworkers, supervisors, and the public."  (Tr. 22 (citing Tr. 294)).  The ALJ failed to adequately reconcile these findings because, in determining Lewis' RFC, he failed to consider the effects of Lewis' mental and neck impairments, which he is required to do, even if he finds those impairments non-severe.  For all of these reasons, the ALJ's determination that Lewis is not disabled is not supported by substantial evidence.

### 1.     *The ALJ's Step Two Analysis*

At Step Two of the sequential evaluation process, the ALJ must consider whether a claimant has a severe impairment.  *See* 20 C.F.R. §416.920(a)(4).  "To surmount the step two hurdle, the applicant bears the ultimate burden of establishing that the administrative record contains objective medical evidence suggesting that the applicant was 'disabled,' as defined by the Act . . . ."  *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir. 2007).  The applicable regulations generally define a "severe" impairment as an "impairment or combination

14

of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. §416.920(c).  Basic work activities are defined in the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §416.921(b).  Examples include:  (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *See id.*  The Sixth Circuit has "characterized step two of the disability determination process as a '*de minimis* hurdle.'"  *Despins*, 257 F. App'x at 929. "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

In this case, the ALJ's conclusion that Lewis' affective disorder does not rise to the level of a severe impairment under the Act is not supported by substantial evidence.  In reaching this conclusion, the ALJ considered the four broad functional areas set forth in the disability regulations for evaluating mental disorders (the "paragraph B" criteria) and concluded that Lewis has only mild limitations in activities of daily living and maintaining concentration, persistence, or pace, and no limitation in social functioning.  (Tr. 20-22 (citing 20 C.F.R., Part 404, Subpart P, Appendix 1)).  The ALJ then concluded, citing 20 C.F.R. §404.1520a(d)(1),[5] that Lewis' mental impairment is non-severe.

The Commissioner argues that this conclusion is correct, pointing out that the ALJ gave

---

[5] These regulations provide, in relevant part:  "If we rate the degree of your limitation in the first three functional areas as "none" or "mild" … we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities …."  20 C.F.R. §404.1520a(d)(1).

"great weight" to the opinion of Sheila Williams-White, the state agency consultant who reviewed Lewis' medical records and opined that his medical impairment was non-severe. (Doc. #15 at 14 (citing Tr. 326)). It is true that, under certain circumstances, "an ALJ may give the non-examining medical source opinion greatest weight," as the Commissioner asserts. (Doc. #15 at 14). In this case, however, the ALJ also purported to give "some weight" to the opinion of the consultative psychiatric examiner, Dr. Gummadi, saying, specifically:

> Moreover, some weight is given to Dr. Gummadi. Dr. Gummadi opined that the claimant would be able to understand, retain, and follow simple instructions. Dr. Gummadi also reported that the claimant would be able to perform simple, routine, repetitive tasks. Finally, Dr. Gummadi stated that the claimant would be best able to function in a setting where there was only brief interaction with coworkers, supervisors, and the public. Some weight is given to this opinion, as it is consistent with the general notion that the claimant is not disabled.

(Tr. 22 (citing Tr. 294)). Regardless of the weight accorded to Ms. Williams-White's opinion, the Court simply cannot square the ALJ's decision to give some weight to Dr. Gummadi's opinion with his conclusion that Lewis' mental impairment is non-severe, or, more importantly, with his failure to include any mental limitations in Lewis' RFC.

As set forth above, Dr. Gummadi opined that Lewis could only "understand, retain, and follow simple instructions," "perform simple, routine, repetitive tasks," and "function in a setting where there was only brief interaction with coworkers, supervisors, and the public." (Tr. 294). Indeed, this was the entirety of the "medical source statement" portion of Dr. Gummadi's report, and it is essentially the *only* portion of the report wherein Dr. Gummadi opines as to Lewis' mental limitations. The Court simply cannot reconcile the ALJ's giving "some weight" to these significant mental restrictions, while simultaneously determining that Lewis' mental impairments were non-severe.[6]

_____

[6] Lewis also points to his GAF scores of 45 and 50 as evidence that his mental impairment is

After the ALJ finds the existence of a severe impairment, he must properly determine the claimant's RFC before reaching a decision on the ultimate question of disability. *See Detzler v. Comm'r of Soc. Sec.*, 2013 WL 6587848, at *2 (E.D. Mich. Dec. 16, 2013) (ALJ must assess claimant's RFC before determining at Steps Four and/or Five whether claimant can perform past relevant work or other work that exists in the national economy). Thus, while a claimant certainly may have impairments which do not result in a finding of "disabled," the ALJ must still first determine an RFC which incorporates all of a claimant's limitations, and only then, determine whether, with those limitations, he is disabled. Here, the ALJ seemed to erroneously operate in the reverse, concluding that Lewis was not disabled and then finding that, in formulating Lewis' RFC, he could give "some weight" to Dr. Gummadi's opinion ***because*** it was not inconsistent with that finding. (Tr. 22) ("Some weight is given to this opinion, ***as it is consistent with the general notion that the claimant is not disabled***.") (emphasis added). As discussed below, this resulted in the ALJ erroneously failing to include in Lewis' RFC any mental limitations.

The ALJ's consideration of Lewis' neck impairment was also erroneous. Following a serious car accident, Lewis underwent an anterior cervical discectomy with fusion and fixation

---

severe. (Doc. #12 at 9-10). While the Commissioner is correct that GAF scores alone do not establish the presence of a severe impairment, *White v. Comm'r of Soc. Sec.*, 2011 WL 5104622, at *3 (E.D. Mich. Oct. 27, 2011), the fact remains that these scores are indicative of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See* American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders*, (4th ed. 2000), p. 34. Thus, viewing these GAF scores in the context of the record as a whole – including Dr. Gummadi's opinion, which was accorded "some weight" – certainly suggests that Lewis' mental impairment is severe. This is especially true where Dr. Gummadi characterized Lewis' prognosis as "guarded"; where the consultative physical examiner, Dr. Shelby-Lane, opined that Lewis required "ongoing mental health treatment for his post-traumatic stress disorder"; and where Lewis' treating social worker repeatedly noted that his thoughts were preoccupied with his health concerns and chronic pain. (Tr. 294, 300, 342-43).

17

on April 13, 2009.  (Tr. 211-15, 262).  Thereafter, Lewis continued to report pain in his neck, which at times radiated into his left shoulder and down his left arm.  (Tr. 277, 286-90, 339, 359). Despite this fact, the ALJ did not conclude that Lewis' neck impairment was severe.  (Tr. 20).

The Commissioner attempts to buttress the ALJ's determination in this regard by arguing that, "The record does not show that any neck pain that Plaintiff experienced resulted in any significant limitation in Plaintiff's ability to perform basic work activities such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling."  (Doc. #15 at 15). The problem, however, is that the ALJ gave "some weight" to the opinion of the consultative physical examiner, Dr. Cynthia Shelby-Lane, who noted that Lewis had "chronic neck and shoulder pain," and opined that he "should avoid repetitive and heavy lifting, bending, pushing and pulling and use of his upper extremities."   (Tr. 299-300).   Again, then, as with his determination regarding Lewis' mental impairment, the ALJ perplexingly gave "some weight" to this physician's opinion, while simultaneously rejecting – without explanation – her opinion that Lewis was significantly limited in lifting, pushing, pulling, and reaching.

In summary, the ALJ's decision to give "some weight" to the opinions of Dr. Gummadi and Dr. Shelby-Lane, but to then wholly disregard the crux of those opinions without explanation, does not adequately explain to Lewis why he is being denied benefits.  As such, the ALJ's conclusion that Lewis' mental and neck impairments are non-severe is not supported by substantial evidence.

### 2.    The ALJ's RFC Determination

The Commissioner argues that even if the ALJ erred in finding Lewis' mental and neck impairments to be non-severe, this error was harmless "because the ALJ found a severe impairment at step two and accounted for all of Plaintiff's limitations in his RFC finding."  (Doc. #15 at 15).  It is true that, if the ALJ considered *all* of Lewis' impairments – both severe and

18

non-severe – in formulating his RFC, then his failure to find additional severe impairments at Step Two does not constitute reversible error. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). As set forth below, that principle does not apply here because the RFC failed to properly consider Lewis' impairments.

The law is clear that, in determining an individual's RFC, "Once one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe." *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009); *see also* 20 C.F.R. §404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity … we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."); 20 C.F.R. §404.1545(a)(2) ("*If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity.*") (emphasis in original). Moreover, Social Security Ruling 96-8p provides that:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

*Soc. Sec. Rul. 96-8p*, 1996 WL 374184, at *5 (July 2, 1996). In summary, once the ALJ

determined that Lewis suffers from a severe physical impairment (here, "degenerative back disease"), he was required to consider that impairment in combination with Lewis' other severe or non-severe impairments (here, Lewis' mental and neck impairments), in assessing his RFC. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190-91 (6th Cir. 2009).

In this case, there is no indication that ALJ considered the effect of Lewis' mental impairment when formulating his RFC.  Indeed, the RFC makes no mention whatsoever of any limitations resulting from Lewis' mental impairment, and indicates only that Lewis has the RFC to perform medium work with certain additional postural limitations.  (Tr. 22).  This is true despite the fact that the ALJ specifically found Lewis to be limited in the areas of activities of daily living and maintaining concentration, persistence, or pace, and despite the fact that the ALJ gave "some weight" to Dr. Gummadi's opinion that Lewis would only be able to "understand, retain and follow simple instructions" and "perform simple, routine, repetitive tasks," and "would best be able to function in a setting where there was only brief interaction with coworkers, supervisors, and the public."  (Tr. 21-22 (citing Tr. 294)).  For these reasons, the ALJ erred in failing to consider Lewis' mental impairment in formulating his RFC.  *See Al Ghawalb v. Comm'r of Soc. Sec.,* 2012 WL 2804837, at *6 (E.D. Mich. July 10, 2012) (remanding the case where the ALJ considered only the claimant's physical impairments, not his non-severe mental impairment, in formulating the claimant's RFC).  Because the ALJ failed to consider Lewis' mental impairment in determining his RFC, the Court cannot conclude that the ALJ's finding that Lewis can perform his past relevant work as a forklift operator (which is semi-skilled in nature) is supported by substantial evidence.  *See Al Ghawalb*, 2012 WL 2804837 at *6.

In addition, it is not at all clear from the ALJ's decision that he considered the effect of Lewis' neck impairment when formulating his RFC.  As discussed above, in determining Lewis'

20

RFC, the ALJ explicitly gave "some weight" to the opinion of the consultative physical examiner, Dr. Cynthia Shelby-Lane, saying:

> As for the opinion evidence, some weight is given to Dr. Shelby-Lane. Dr. Shelby-Lane opined that the claimant should avoid repetitive, heavy lifting, bending, pushing, pulling and using his upper extremities. Some weight is given to this opinion, as it is generally consistent with the medical evidence and the claimant's residual functional capacity of having occasional postural limitations.

(Tr. 24). Despite indicating that he was giving "some weight" to this opinion, the ALJ (1) found that Lewis could perform medium work (which requires lifting 50 pounds occasionally), and (2) did not find that Lewis was limited at all in pushing, pulling, or using his upper extremities. (Tr. 22). Again, these competing aspects of the ALJ's decision simply cannot be reconciled: the ALJ cited Dr. Shelby-Lane's opinion that Lewis should avoid heavy lifting, pushing, pulling, and reaching; explicitly gave "some weight" to that opinion; but then ignored these crucial aspects of that opinion in formulating Lewis' RFC. As a result, the ALJ's conclusion that Lewis can perform his past relevant work as a forklift operator – which would require pushing, pulling, and reaching with the upper extremities (Tr. 58) – is not supported by substantial evidence.

## III.    CONCLUSION

For foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [15] be DENIED, Lewis' Motion for Summary Judgment [12] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Recommendation.

Dated: February 3, 2014                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

## **NOTICE**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 3, 2014.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

22